UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

In Re

DELMONT O. DAPREMONT, JR.                     Case No. 03-17206-MAM-7

    Debtor

### ORDER GRANTING RELIEF FROM THE STAY IN 120 DAYS TO LIBERTY BANK AND GRANTING THE TRUSTEE'S MOTION TO RECONSIDER HER ABANDONMENT OF THE PROPERTY AT ISSUE

    Irvin Grodsky, Attorney for the Debtor, Mobile, AL
    Denise I. Littleton, Chapter 7 Trustee, Mobile, AL
    Gerard O. Salassi, IV, Attorney for Liberty Bank, Metairie, LA
    David S. Conrad, Attorney for Liberty Bank, Mobile, AL

This case is before the court on the motion of Liberty Bank for relief from the stay to pursue state law remedies against real property of the debtor and others. This court has jurisdiction to hear this case pursuant to 28 U.S.C. §§157 and 1334 and the Order of Reference of the District Court. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2) and the court has the authority to enter a final order. For the reasons discussed below, the court is granting the motion for relief from stay effective 120 days from the date of this order, and, in conjunction with the motion for relief from the stay, is granting the trustee's motion to reconsider her abandonment of the subject real property..

FACTS

Delmont Dapremont, Jr., was a guarantor, together with his wife and other family members, of a note entered into between American Auto Sales, Inc., as maker, and Liberty Bank. The note was a part of the indebtedness owed by AAS (which was a used car dealer in Mobile,

1

Alabama) to Liberty Bank. Certain real property owned, in part, by Dapremont, was collateral for the loan. After Dapremont filed this bankruptcy case on December 10, 2003, Liberty Bank moved for relief from the stay to pursue its state court remedies against the property.[1]

The parties stipulated that the balance due on the note was $350,624.00 on December 31, 1999. The debtor proved, at least in part, and/or Liberty Bank admitted after a day of trial, that AAS should be given certain reductions in that debt. Specifically, Liberty Bank agrees that the following amounts should be deducted from the loan balance: $92,147.00 (the reserve checking account balance); $6,739.28 (one fourth percent reserve account adjustment); $4,843.14 (amount that should have been credited to the reserve account for the last months of its existence); and $21,331.75 (credits from sales of repossessed AAS collateral in the year 2000).

The Bank and Dapremont have a dispute as to whether Dapremont is entitled to further setoffs from the debt. Dapremont claims three other reductions should be made. (1) AAS should receive a credit of $62,438.42 for commissions and expense reimbursement to AAS for AAS's sale of other dealers' repossessed autos; (2) AAS should have been charged the nondefault rate of interest on its debt instead of the default rate; and (3) Liberty Bank is entitled to no attorneys fees or expense recovery from Dapremont because of Liberty Bank's errors in calculating AAS's debt.

---

[1] The motion for relief from the stay was filed on March 16, 2004. The motion is a difficult one. The court and the parties had trouble determining the impact of the prebankruptcy Louisiana state court executory process proceeding on this case. The most difficult issue was whether the amount of the debt AAS owed to Liberty Bank was necessarily determined as a part of that proceeding or whether that issue remained an open question. After voluminous briefing and argument by counsel to the court, the court determined that the issue of the amount of the claim was not determined in the executory process action. Therefore, this court had to determine the amount of the debt. As is obvious from the court's findings, the court was correct that the amount of the debt had never been fully examined or litigated.

The amount of AAS's debt is at issue in Dapremont's individual chapter 7 bankruptcy case because Liberty Bank is seeking relief from the stay to foreclose upon two parcels of real estate of which Dapremont is a part owner. The real estate is collateral for the debt of AAS at issue. Dapremont and Liberty Bank agreed the properties should be valued as follows:

| | | |
|---|---|---|
| Chadbourne property | $185,000 | (Debtor has a one half interest-wife has other half) |
| Pauger property | $ 89,900 | (Debtor has a one sixth interest) |
| Total | $274,900 | |

To the extent that there is equity in the properties, the equity is possibly available to Dapremont's creditors in his bankruptcy case.

Dapremont's statement of intentions indicated that he was surrendering his interest in the properties. On April 22, 2004, the trustee filed notices of abandonment of Dapremont's interest in the Chadbourne and Pauger properties interest because the properties were not the debtor's homestead and the debtor had no equity in the property. The court granted the trustee's proposals to abandon the properties by order dated May 14, 2004. Once the trustee became aware of Dapremont's contest of the amount of the Bank's claim in response to the motion to lift stay, the trustee moved to have her abandonment reconsidered. That motion is also pending.

LAW

In considering a relief from stay motion, the court must look to 11 U.S.C. § 362. Under section 362, the creditor bears the burden of proving that the debtor has no equity in the property at issue. 11 U.S.C. § 362(g)(1). The debtor bears the burden of proving all of the other elements. 11 U.S.C. § 362(g)(2). There are three issues to be decided: (1) whether AAS was to be credited with commissions and expense reimbursements for sales of certain repossessed cars; (2) whether

3

the default interest rate was properly charged on the AAS debt; and (3) whether the Bank should be allowed to tack any attorneys fees or expenses on the debt owed by AAS. All of these issues go to the amount of the debt owed to Liberty Bank. Without resolution of these issues, the Bank cannot prove that Dapremont has no equity in the Chadbourne and Panger property. The court will address these issues after first discussing Liberty Bank's initial argument that it alleges precludes consideration of any other argument

A.

Liberty Bank asserts that once Dapremont filed a statement of intentions in his bankruptcy petition that stated he was surrendering his interest in the Chadbourne and Panger property, relief from the stay is due to be granted as to Dapremont as a matter of course. The surrender of his interest means he no longer had any right to the property. Then, when the trustee abandoned her interest, relief from the stay should have been granted as a matter of course.

The general rule is that once property is abandoned by the trustee, the abandonment is irrevocable. 11 U.S.C.§ 554; *In re Weisner*, 267 B.R. 32 (Bankr. D. Mass. 2001). This is true even if the trustee subsequently discovers that the asset abandoned has a value greater than what the trustee initially believed. *Cusano v. Klein*, 264 F.3d 936, 38 (9th Cir. 2001); *In re Wick,* 249 B.R. 900 (Bankr. D. Minn. 2000), *jdgt. rev'd on other grounds*, 256 B.R. 618 ( D. Minn. 2001). However, an abandonment may be revoked if the debtor concealed information from the trustee or if the trustee did not possess sufficient information. *In re Schoenewerk*, 304 B.R. 59 (Bankr. E.D.N.Y. 2003). In this case, the failure to have proper information is due to creditor action, not debtor action. The debtor has not changed his view about the value of the assets; what has changed is the Bank's professed claim. By its own admission, without taking into account the

4

commissions, attorneys fees or interest rate issues, the Bank debt is no more than $225,563.83 instead of $350,624.00 as claimed. This amount is less than the value of the property at issue. Equity for the creditors is more likely with the debt at $225,000 (with possible interest and attorneys fees additions) than if the debt is $350,000. If the Bank had properly calculated its debt, the trustee would have been able to determine more easily whether the debtor's theories about commissions, interest rates and attorneys fees were likely correct. This case is unlike the cases where the debtor misstated the value of the property and the trustee should have known that the property value was wrong. Property value is always within a trustee's power to determine. The proper amount of a claim is more difficult, however, particularly when the debt is one of another entity. When the creditor who seeks to have the property abandoned for its benefit negligently or improperly inflates its debt, a trustee is unlikely to know this or have facts readily available to make a determination that the debt amount is wrong. The cases that hold that an abandonment is irrevocable deal with debtors who list the asset at a lesser value. No case deals with an abandonment based on a creditor's gross misstatement of the amount of its debt in its proof of claim. Since the benefit of the misstatement directly benefits the creditor, it should not be allowed to prevent revocation of the abandonment. The misstatement equates to a debtor misleading the trustee as to the value of an asset. *In re Schoenewerk*, 304 B.R. 59, 60 (Bankr. E.D.N.Y. 2003); *In re Gonzalez*, 302 B.R. 687 (Bankr. C.D. Cal. 2003). In the case of deception by the debtor, a trustee can revoke an abandonment. The same policy should apply to a creditor.

Liberty Bank also asserts that had it known that the trustee might seek to revoke her abandonment or have it reconsidered, and had it known that Dapremont would contest relief from the stay even after his statement of intention stated he was surrendering the property, Liberty Bank

5

might have objected to the dischargeability of its debt in this case. Now it is too late.

The court finds this argument to be without merit. First, nothing precluded the Bank from objecting to the discharge of the debtor or the dischargeability of its debt. Second, the fact that the debtor contests the amount of the debt AAS owes to the Bank and contests whether his nonexempt property should be taken by the Bank has no correlation to whether the Bank has a cause of action under 11 U.S.C. §§ 523 or 727.

B.

Dapremont claims that Liberty Bank and AAS had an agreement that AAS would sell certain autos repossessed by Liberty Bank. The autos were subject to auto loans of the Bank, but were not vehicles for which AAS owed the Bank. They were repossessed autos of other auto dealer(s). A bank official, per Dapremont, asked AAS to sell the vehicles for a commission of $1,100 per car plus reimbursement of sales costs and licensing fees. No bank official stated unequivocally that such an agreement existed, but one of the bank officers, Mr. Ed Wood, indicated that there could have been such an arrangement. There were records introduced that showed that AAS had been paid for at least several autos as Dapremont testified.

Dapremont asserts that AAS has not been paid and reimbursed $62,438.42 for vehicles sold. His evidence consists of some, but not all, of the paperwork for the noncompensated sales. He testified that he kept the information he introduced for each car until he was paid. Then he removed the papers from the file he had. He no longer has all of the other paperwork. It has been five years since AAS closed.

The court judged the credibility of the witnesses. The Bank officials were evasive and not forthcoming about the repossessed vehicles. Even though it was clear that Dapremont had sold

6

some vehicles for the Bank, no one seemed to know about the arrangement. AAS would not have sold vehicles for free. The evidence is that there were 80+ vehicles that AAS sold without full or partial payment of commission by the Bank and without expense reimbursement. The Bank had to have someone who knew what the situation was--why vehicles were being carried from Baton Rouge to Mobile, and how they were being sold in Mobile. Yet no one professed any knowledge. The testimony of Edward Wood, an officer of the Bank, indicated that there was an arrangement, but he was not able to fill in the details. A memorandum to Dapremont from the Credit Administration Division of the Bank also documents the fact that an agreement was in force. (Debtor's Exhibit 21).

Dapremont was convicted in 2000 or so of tax evasion and served time in prison from January 24, 2001, to December 24, 2003. However, on this issue the court found him to be very credible. It was clear AAS sold the cars. It was clear AAS had been compensated as Dapremont indicated in the past. It defies reason to think AAS did not expect to be compensated similarly as to these vehicles. The Bank has, with the stipulated changes to the debt, already shown that it has not handled the AAS debt with complete accuracy.

The court finds that the Bank had the burden of proving that the debt of AAS was such that Dapremont had no equity in the Chadbourne and Pauger properties. The Bank did not outweigh the evidence produced by Dapremont on this issue. The court concludes that AAS is owed $62,438.42 for commissions and reimbursements which amount should be deducted from the AAS debt to Liberty Bank.

Liberty Bank asserts that the commission agreement, if there is one, cannot be enforced because it is a "credit agreement" under Louisiana law and must be in writing to be enforceable.

7

La.R.S. 6:1121 defines a "credit agreement" as "an agreement to lend or forbear repayment of money or goods or to otherwise extend credit, or make any other financial accommodation." The commission agreement between AAS and the Bank is not an agreement to lend money, to forbear repayment of money or goods, to extend credit or to make a financial accommodation. The agreement was a contract between AAS and the Bank.

The Bank cites four cases that it asserts show the "credit agreement" nature of the commission agreement between AAS and Liberty. *Whitney National Bank v. Rockwell*, 661 So. 2d 1325 (La. 1995); *Casey v. Hibernia Corp*, 709 So.2d 933 (La. App. 4th Cir. 1998); *Ultra Fabricators, Inc. v. M C Bank and Trust Co.*, 724 S.2d 210 (La. App. 1st Cir. 1998); *Jesco Constr. Corp. v. Nationsbank Corp.*, 830 So.2d 989 (La. 2002). None of the cases are like this case. The *Whitney Bank* case involved a loan agreement that the debtor argued was verbally amended as to repayment terms. The *Casey* case concerned a bank's alleged failure to monitor a construction loan that hinged on whether the loan required monitoring. The *Ultra Fabricators* case involved a loan agreement that allowed the bank to demand payment of receivables directly from the third party payors who owed the debtor. Finally, the *Jesco* case involved a loan application that was terminated prior to funding. La.R.S. 6:1121 was implicated in each of these cases because a loan agreement was the basis for the claim. In this case, the commission agreement is separate from the loan. It was a contract between the Bank and AAS. The contract had no ties to the loan to AAS at all and is not mentioned in any of the terms of the note between the parties.

Therefore, contract law applies to the agreement. As Liberty Bank states, La.C.C. art. 1846 applies to the arrangement between AAS and the Bank. Article 1846 states as to contracts

8

for amounts in excess of $500 that "the contract must be proved by at least one witness and other corroborating circumstances." Also applicable is La.C.C. art. 1831 which states that "a party who demands performance of an obligation must prove the existence of the obligation." In this case, two witnesses proved the existence of the contract. Mr. Dapremont clearly testified that a contract existed. Mr. Wood, by not denying that a contract existed, also offered corroboration of the contract's existence. Finally, the memo from the Bank indicating payments to AAS of $1100 commissions for some identical transactions provides proof. There is sufficient evidence under the statutes. The evidence is clearly a preponderance because no witness absolutely denied the existence of an agreement. As stated above, the Bank's actions in sending the autos to AAS and AAS's actions in selling them showed that the parties had to have some agreement. Their actions make no sense otherwise.

If there was not a contract between the parties, AAS was entitled to compensation and reimbursement of expenses from Liberty Bank on a quantum meruit or "enrichment without cause" basis. La.C.C. Art. 2298 provides:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.
>
> The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.

"To prove a case of enrichment without cause, the plaintiff must demonstrate: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification or cause for the enrichment and impoverishment; and, (5) the lack of any

9

other remedy at law." *Gulfstream Services, Inc. v. Hot Energy Services, Inc.*, 2005 WL 676365, *3 (La. App. 1st. 2005). In this case, all of the elements were proved. The Bank had 80+ repossessed vehicles sold and received the value of the new loans on those autos. AAS reconditioned and sold the vehicles and paid the tax, title and license fees out of its own funds. There is a direct connection between the sales and the new loans obtained by the Bank. There is no reason that the Bank should receive the services of AAS free of charge. If AAS and the Bank did not have any contract (which the court concludes they did), then, alternatively, this is the only method by which AAS can receive compensation.

The court concludes that there was a contract between the Bank and AAS for sale of the repossessed autos of the Bank with AAS to receive $1100 per vehicle and reimbursement of expenses. Alternatively, if there was not a contract, AAS is entitled to reimbursement on an "enrichment without cause" basis. The court finds that the Bank owes AAS $62,438.42.

C.

The second issue concerning the debt is whether the default or nondefault interest rate should be applied to AAS's debt. This issue is governed by the contract.

The paragraph of the contract entitled "Default" and "Lender's Rights Upon Default" state:

> **DEFAULT**. The following actions and/or inactions shall constitute default events under this Note.
>
> > **Default Under This Note**. Should Borrower default in the payment of principal and/or interest under this Note.
> > * * * *
>
> **LENDER'S RIGHTS UPON DEFAULT**. Should any one or more default events occur or exist under this Note as provided above, Lender shall have the right, at its sole option, to declare formally this Note to be in default.

10

AAS was in default on the loan before Dapremont's bankruptcy filing. Thus a default had occurred. The evidence did not include any default notice given to AAS. Dapremont alleges that a formal notice of default as required by the contract was never given. Because it was Liberty Bank's burden to prove the amount of its debt to prove what equity, if any, the debtor had in the real estate in the case, the lack of proof of compliance with the contract regarding notice of default requires the court to conclude that the nondefault interest rate should apply. A "formal" declaration of default is not defined. However, to this court, simply treating the loan as in default does not appear to be any "formal" act of declaring default. The language of the loan document was presumably drafted by the Bank and must be construed against the drafter. *Joyner v. Liprie*, 896 So. 2d 363 (La. App. 2nd Cir. 2005). The court concludes there was no formal declaration of default.

The court does not have the capacity to calculate the nondefault interest due on the loan. Dapremont asserts the amount is $55,194.67. The court will require the trustee and the Bank to agree on the amount after a calculation is done and require that the amount to be paid to the Bank if the trustee is able to liquidate Dapremont's interest in the property.

D.

Finally Dapremont asserts that Liberty Bank should be allowed no prepetition attorneys fees and expenses for its collection efforts in this case. The AAS and Liberty Bank contract provides that the Bank can insist upon "immediate payment . . . of the unpaid principal balance . . plus accrued interest, together with reasonable attorneys' fees, costs expenses and other fees and charges." Are the fees of $ $20,230.80 and expenses of $12,902.88 reasonable in this case?

11

Liberty asserts it had to file two executory process proceedings and, in those proceedings, Dapremont had opportunities to raise defenses to the amounts owed to the Bank and did not do so. The Bank also had to deal with appeals in those proceedings.

Dapremont alleges that the Bank filed two proceedings in Louisiana in which it swore that the debt owed by AAS was more than $395,000 when that was, in fact, untrue. Dapremont also alleges that the Bank swore that more than $1,320,000 in "checks drawn on Community Bank of Mobile [were] used to pay down commercial loan of credit at Liberty" (Liberty Exh. #16) and that statement was misleading and false. Dapremont also alleges that the Bank caused some of its own fees when it was required to recommence the executory proceeding because it did not follow "the strict requirements of executory process." *Liberty Bank and Trust Company v. Joan Miller and Delmont Dapremont, Jr.*, 803 So.2d 387, 391 (La. Ct. App. 4th 2001). As to the Bank's argument that AAS did not contest the amount of AAS's debt to the Bank, Dapremont alleges that it clearly did raise the issue. In the first executory proceeding, in Dapremont's petition for a preliminary injunction, he stated:

> Liberty has kept money that belongs to the corporation that belongs in the reserve account held by Liberty and Liberty has not made and will not make an accounting to the corporation notwithstanding being requested to do so. Liberty has also charged interest in excess of that which it said it was going to charge on certain consumer transaction under the floor plan and they have kept more money than Liberty should have kept and in addition Liberty has failed to make an accounting of these amounts although the corporation has requested paying.

Dapremont, in the second proceeding, incorporated his allegations in the first case by a "general statement by reference to the first petition for preliminary injunction." Debtor's Memorandum of June 21, 2004, p.3.

In this case, Liberty Bank initially alleged AAS owed it $395,000 (excluding attorneys
12

fees). Dapremont disputed this amount and the court required a hearing on the merits. After the first full day of hearing, it became obvious to the court, and the parties that the accounting of the Bank was inaccurate and that further review and documentation were needed. The court recessed the hearing to allow the records to be produced. When the parties returned about four months later, the Bank stipulated that its claim should be reduced to $225,562.83. The court has now concluded that $62,438.42 must also be deducted from the amount owed for commissions and expenses and only nondefault interest at the rate of 2 1/2% over the prime rate can be charged. Therefore, the Bank's debt is less than half of what was originally claimed.

Prebankruptcy, Liberty Bank sued Dapremont and the other guarantors in Louisiana courts in an executory process proceeding to collect the debt. The Bank claimed more than $395,000 was due and swore to that amount in at least two affidavits. The Bank, in bringing its executory process action was found, upon appeal by Dapremont and the other guarantors, to have given ineffective notice and had to redo its suit which added to both Dapremont and the Bank's fees. Dapremont and the other guarantors, by not having a correct amount owing known to them, were potentially prejudiced. With a substantially lower claimed amount due, the guarantors might have been able to raise capital to settle the case.

Liberty Bank's cavalier attitude about this debt is disturbing. Sums were wrongly credited or not credited at all. Liberty took advantage of AAS by its use of AAS to sell its repossessed vehicles without compensation. The fact that, by its own admission, it was 35-40% off on the debt owed is enough alone to cause the court to find any payment of fees to Liberty to be "unreasonable."

The court does not fault the attorneys who could only work with the numbers the Bank

13

gave to them. However, the Bank should pay the attorneys fees and expenses, not AAS or Dapremont. The attorneys did all they were hired to do, but they were provided with very flawed data. The Bank should not add even more to AAS's secured debt and keep funds from creditors of this estate because of its own negligence or worse.

As to the repossession commissions, the court believes the bank officials knew of this debt and simply did not honor it. It makes no sense that the Bank would allow AAS to transport its repossessed autos from Baton Rouge to Mobile, sell them, pay the title, tax and registration fees on them, all at no cost to the Bank. The Bank's own records even belie this idea.

For both reasons, the attorneys fees are not "reasonable." The fees were to collect a debt that never existed---a claimed debt at least two times what was owed; a debt that Bank officials swore in affidavits was correct and was not. The fees were to collect a debt that was never credited with sums the Bank had to know were owed to AAS for sales for it by AAS.

Both the Bank and Dapremont cite to the Eleventh Circuit case of *Welzel v. Advocate Realty Investments, LLC (In re Welzel)*, 275 F.3d 1308 (11th Cir. 2001) in discussing the issue of reasonableness. The Welzel case held that in order to have a prepetition fee included as a part of a creditor's secured claim under § 506(b), a creditor's attorney's fees and charges must be determined to be reasonable under federal law and not state law. *Id*. at p. 1313. Any fee or charge that is not determined to be "reasonable" under federal law may still be allowed as an unsecured claim. *Id.* The federal courts have focused upon whether the fees are "necessary to the collection and protection of a creditor's claim." *In re Huhn*, 145 B.R. 872, 876 (W.D. Mich. 1992); *In re Ward*, 190 B.R. 242, 245 (Bankr. D. Md. 1995). The courts, in making that determination, have used the twelve factor lodestar test first articulated in *Johnson v. Georgia*

14

*Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). The twelve factors are:

> (1) time and labor required;
> (2) novelty and difficulty of the questions raised;
> (3) the skill required to properly perform the legal services rendered;
> (4) the preclusion of other employment by the attorney due to the acceptance of the case;
> (5) the customary fee charged for like work;
> (6) whether the fee sought is fixed or contingent;
> (7) the time limitations imposed by the client of the circumstances;
> (8) the amount in controversy and the results obtained;
> (9) the experience, reputation, and ability of the attorney;
> (10) the "undesirability" of the case;
> (11) the nature and length of the professional relationship between the attorney and the client; and
> (12) attorney fee award in similar cases.

*Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 877-78 (11th Cir. 1990)(adopting the twelve factor standard). *See also In re Friedel*, 324 B.R. 138, 144(Bankr. M.D. Ala. 2004)(stating that Alabama state courts use similar factors to determine reasonableness).

In this case, all but one of the twelve factors have been met by the attorneys who handled this case based upon the work they did. However, factor eight requires the court to look at the "results obtained." The attorneys were successful in their pursuit of judgment in the executory process proceedings. However, the results were obtained based upon a grossly inaccurate calculation of the amount owed by AAS. On equitable grounds as well, the fees and expenses are not reasonable for all of the reasons stated above.

Liberty Bank will not be awarded attorneys fees or expenses under the circumstances of this case. Thus, $20,230.80 in fees and $12,902.88 in expenses will not be added to the secured claim of the Bank. However, these fees and expenses are part of the allowed claim of the Bank pursuant to 11 U.S.C. § 502 and will be treated as a general unsecured claim by the trustee.

E.

15

Case 03-17206   Doc 129   Filed 07/13/05   Entered 07/13/05 09:59:35   Desc Main
Document      Page 15 of 16

The debt owed to AAS is $218,319.08.[2] The Chadbourne and Pauger properties have a value of $274,900.[3] Therefore, there is equity in the properties. The debtor's share of this equity is at least $22,066.55.[4] Therefore, Liberty Bank did not prove that Dapremont had no equity in the property.

Since Dapremont indicated he was surrendering his interest, the trustee has a right to the equity for creditors. The court, for the reasons stated in paragraph A above, is allowing the trustee to reconsider her abandonment.

The court will give the trustee 120 days to market the property. If she has not sold the estate's interest in that time, the stay will lift without further court order on November 10, 2005.

IT IS ORDERED that:

1. The motion of Liberty Bank for relief from the automatic stay is GRANTED effective November 10, 2005; and

2. The motion of the trustee to revoke her abandonment of the debtor's interest in the real property discussed in this ruling is GRANTED.

Dated: July 13, 2005

_____
MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE

---

[2] This number assumes that the debtor's calculation of the nondefault interest rate is correct. The court intends the debt to be the number reached when the interest at the nondefault rate is properly calculated.

[3] These are the values placed on the properties by the stipulation of the parties. No other values were established.

[4] This equity is based on Dapremont's own interest in the properties leaving aside the issue of his wife's share. His share is 39% of the whole.